TIBOR GLAZ vs. RALSTON PURINA COMPANY.

Middlesex.    May 8, 1987. — June 25, 1987.

Present: ARMSTRONG, DREBEN, & FINE, JJ.

Contract, Employment. Public Policy.

In an action by an employee at will against his former employer, seeking
damages on the theory that the termination of his employment was
wrongful because it had violated public policy, the defendant was entitled
to summary judgment where the plaintiff failed to show the existence
of any genuine factual issue as to whether he was discharged in retaliation
for socially desirable conduct that public policy would encourage, and
where he did not claim either that he was discharged for exercising a
statutory right or for refusing to commit an unlawful act. [388-390]

CIVIL ACTION commenced in the Superior Court Department
on June 22, 1979.

The case was heard by James F. McHugh, III, J., on a
motion for summary judgment.

Damon Scarano for the plaintiff.
Timothy Q. Feeley for the defendant.

FINE, J. Tibor Glaz, a former marketing executive employed
for more than sixteen years by the Ralston Purina Company
(Ralston), appeals from the entry of summary judgment in favor
of Ralston on various claims arising out of Glaz's discharge from
employment in 1975. The only such claim which is not clearly
time-barred, frivolous, or inadequately argued on appeal alleges
a bad faith discharge in breach of his employment contract.

Before the judge when he ruled on the summary judgment
motion were a stipulation of the parties and portions of Glaz's
deposition. The stipulation set forth these facts. Born and raised
in Hungary, Glaz left in 1956 and became a United States
citizen. In 1958 he was hired by Ralston. He advanced rapidly
in the company as he moved from posts in the United States
to various locations in Western Europe. In 1967, he became
the manager of Ralston's new export department for Eastern

Europe and was assigned to Brussels. Throughout his employment, Glaz was an at-will employee whose only compensation was in the form of salary. He established an excellent performance record for developing a new market for Ralston's products in Eastern Europe, particularly Hungary.

On or about August 1, 1972, Glaz was arrested and imprisoned by authorities in Hungary. In the spring of 1973, he was tried on a lengthy indictment alleging violations of bribery, exchange, and customs laws. He was convicted "on some part of the indictment" and sentenced to three years in prison and a $10,000 fine. He suffered, physically and emotionally, from the mistreatment he received over the course of the twenty-seven months he spent in custody in Hungary. Throughout this period, Ralston paid Glaz's salary, directing it to his wife. Ralston also paid legal expenses, as well as expenses incurred by Glaz's wife for travel related to Glaz's imprisonment. Glaz was released from prison in late 1974. On January 10, 1975, while he was in St. Louis, Missouri, at Ralston's corporate headquarters, Ralston terminated his employment. Ralston paid his salary through Janaury 31, 1975, and an additional $42,500 "as part of a termination package." "Glaz was terminated by Ralston . . . because of his arrest, conviction and imprisonment by authorities of the government of Hungary."

There was very little in the stipulation that related to the substance of the charges against Glaz in Hungary. The parties stipulated that Ralston, as a matter of corporate policy and practice, had complete control over the disbursement of funds, including all disbursements for the Hungarian account made by Glaz, and also that, prior to his arrest, Glaz had advised Ralston, both orally and in writing, "to proceed slowly and not maintain an aggressive pricing policy." Also before the motion judge, but, in his view, entitled to "no weight," was certain deposition testimony in which Glaz attributed his arrest to two factors: Ralston's success in penetrating the market for its products in Hungary; and the rapidly growing power in that country of the Stalinists who were opposed to the influx of western products and techniques. The judge properly disregarded these deposition excerpts which were conclusory in nature and based on hearsay. See *Madsen* v. *Erwin,* 395 Mass. 715, 721 (1985).

Glaz's theory of liability was that his discharge was wrongful because it was in violation of public policy. Noting the absence of even a hint that Ralston was retaliating against Glaz for anything when it discharged him, the judge concluded that the discharge did not violate public policy. Although the law with regard to the tenure rights of at-will employees is in flux[1] and although Glaz's plight was dramatic and compelling, we do not think he made a sufficient showing to bring his case within the contours of the public policy exception as it presently exists. Thus, we discern no error on the part of the trial judge in allowing Ralston's motion for summary judgment.[2]

---

[1] See, e.g, Blades, Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 Colum. L. Rev. 1404, 1413-1414 (1967); Glendon & Lev, Changes in the Bonding of the Employment Relationship: An Essay on the New Property, 20 B.C.L. Rev. 457, 473-474 (1979); Summers, The Contract of Employment and the Rights of Individual Employees: Fair Representation and Employment at Will, 52 Fordham L. Rev. 1082, 1097-1109 (1984); Note, Erosion of the Employment-at-Will Doctrine: Choosing a Legal Theory for Wrongful Discharge, 14 Cap. U.L. Rev. 461 (1985); Note, Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith, 93 Harv. L. Rev. 1816, 1840 (1980); Note, Protecting Employees at Will Against Wrongful Discharge: The Public Policy Exception, 96 Harv. L. Rev. 1931 (1983); Note, Implied Contract Rights to Job Security, 26 Stan. L. Rev. 335, 368 (1974); Note, Challenging the Employment-at-Will Doctrine Through Modern Contract Theory, 16 U. Mich. J.L. Ref. 449 (1983).

[2] We mention briefly two potential obstacles to Glaz's recovery, although we do not rest our decision on them. Conceding that he received full salary for the period ending several weeks beyond the date of his termination, and a $42,500 "termination package", if Glaz had the burden to show a right to recover some damages from Ralston, he has failed to do so. See DeRose v. Putnam Management Co., 398 Mass. 205, 211-213 (1986). Nor has he shown a basis for application of Massachusetts law rather than Missouri law, which adheres much more closely to the traditional rule allowing dismissal of at-will employees with or without cause. See Dake v. Tuell, 687 S.W.2d 191, 192-193 & n.2 (Mo. 1985); Neighbors v. Kirksville College of Osteopathic Medicine, 694 S.W.2d 822, 823-824 (Mo. Ct. App. 1985), and cases cited. The Massachusetts choice of law rules point to Missouri as the jurisdiction whose law most likely governs Glaz's claim. See Bushkin Assocs., Inc. v. Raytheon Co., 398 Mass. 622, 630-634 (1985) (applying a functional approach to choice of law in contract actions: considering the specific contacts and the interests and expectations of parties and states involved). Missouri is where Ralston's corporate headquarters are located and where the employment termination actually took place. The

Traditionally an employer had the right to terminate an at-will employee with or without cause. Implicit in all contracts, however, is a covenant of good faith and fair dealing. *Fortune* v. *National Cash Register Co.,* 373 Mass. 96, 102-104 (1977). Invoking that principle, an exception to the at-will rule, inapplicable here, was made in cases of overreaching by an employer for his financial gain. See *Fortune* v. *National Cash Register Co.,* 373 Mass. at 104-105; *Maddaloni* v. *Western Mass. Bus Lines, Inc.,* 386 Mass. 877, 881-884 (1982). Compare *Gram* v. *Liberty Mut. Ins. Co.,* 384 Mass. 659, 672 (1981); *Tenedios* v. *Wm. Filene's Sons Co.,* 20 Mass. App. Ct. 252, 254-255 (1985). Recently a further exception was recognized, also based on the implied covenant of good faith, for an employee discharged for reasons violating public policy. In *DeRose* v. *Putnam Management Co.,* 398 Mass. 205 (1986), an employee, fired for refusing to tailor his testimony at a criminal trial in accordance with the employer's wishes, was allowed to recover contract damages. See also *Gram* v. *Liberty Mut. Ins. Co.,* 384 Mass. at 668 n.6. Compare *Cort* v. *Bristol-Myers Co.,* 385 Mass. 300 (1982); *Federici* v. *Mansfield Credit Union,* 399 Mass. 592 (1987).

Glaz suggests that Ralston's act of firing him because of the arrest, conviction and imprisonment in Hungary violated public policy because that arrest, conviction and imprisonment resulted from policies pursued by Ralston which were the subject of warnings to Ralston by Glaz. Given Glaz's long tenure with Ralston and the poor treatment to which he was subjected in Hungary, it may well have been "bad, unjust, and unkind" in the circumstances for Ralston to fire him upon his return. Cf. *Richey* v. *American Auto. Assn. Inc.,* 380 Mass. 835, 839 (1980). There are limits, however, to the public policy exception to the at-will rule. An employee must be able to point to some clearly-defined and well-established public policy that is

only facts connecting the controversy to Massachusetts are Glaz's residence here in 1958, when he was first hired by Ralston, and his residence here in 1979, when he filed the complaint. His employment and residence for several years before his termination were in Europe, not in Massachusetts.

threatened by the employer's action. That would be the case if the termination were in retaliation for performing an important and socially desirable act, exercising a statutory right, or refusing to commit an unlawful act. See Note, Protecting Employees at Will Against Wrongful Discharge: The Public Policy Exception, 96 Harv. L. Rev. 1931, 1936-1937 (1983). Glaz does not claim that he was discharged for exercising a statutory right or refusing to commit an unlawful act. The only suggestion, then, is whether he was discharged because of his performance of some act so socially desirable that public policy would encourage it.

We are not so naive as to assume necessarily that Glaz was in fact guilty of commiting illegal or immoral acts in Hungary. His lack of control over Ralston's funds is at least suggestive of innocence. We also may not assume, however, that Glaz did nothing at all to bring about his difficulties in Hungary except to engage in conduct which was both beneficial to Ralston and also in strict accordance with Hungarian law. His deposition testimony in which he speculates about the reason for his apprehension was properly disregarded by the motion judge. It is true that Glaz's conduct may have been lawful, of benefit to Ralston, and even insisted upon by Ralston in the face of contrary advice. Glaz has not shown, however, that his conduct was of any particular social utility. He failed to meet his burden, therefore, of presenting facts showing retaliation by Ralston against him for conduct that public policy would specifically encourage. Compare *Cloutier* v. *Great Atl. & Pac. Tea Co.*, 121 N.H. 915 (1981).

*Judgment affirmed.*