KENNETH MACDONOUGH vs. BOARD OF DIRECTORS OF
MASSACHUSETTS HOUSING FINANCE AGENCY & others.[1]

No. 88-P-1143.

Suffolk. December 14, 1989. - April 23, 1990.

Present: WARNER, C.J., ARMSTRONG, & KAPLAN, JJ.

*Public Employment*, Termination. *Constitutional Law*, Public employ-
ment. *Contract*, Employment. *Public Policy*.

No infringement of any constitutionally protected right of free expression
was demonstrated by a plaintiff who had been discharged by the de-
fendant, his former employer, for substandard performance of his du-
ties [544-545]; nor did the plaintiff show that any public policy consid-
erations were implicated in the termination of his employment [545-
546].

CIVIL ACTION commenced in the Superior Court Depart-
ment on September 9, 1986.

The case was heard by *Mel L. Greenberg*, J., on a motion
for summary judgment.

*Christopher Pilavis* for the plaintiff.

*Richard L. Alfred* (*Wendy E. Warring* with him) for the
defendants.

KAPLAN, J. The plaintiff MacDonough appeals from a
summary judgment of the Superior Court dismissing his
claim which is, essentially, that he was discharged from his
job with the Massachusetts Housing Finance Agency
(MHFA) in violation of law. He has abandoned sundry of
his theories of liability, and his appeal now reduces to the
contentions that the MHFA infringed upon his constitutional
right of free expression and also was in breach of a "public

---

[1]Various officers of the agency.

28 Mass. App. Ct. 538                    539

MacDonough v. Board of Directors of Massachusetts Housing Finance Agency.

policy" duty it owed to him as an employee at will.[2] The contentions are without merit. We affirm. The narrative at point 1 below, a distillation of the relevant parts of the record (many irrelevances were contributed by the plaintiff), sets out the material facts. The course of events is clear and there is no genuine issue regarding it in the meaning of the summary judgment rule, Mass.R.Civ.P. 56(a), 365 Mass. 824 (1974). The questions of law follow at point 2(a) - (c).

1. *Narrative.*

From September 21, 1981, to May 9, 1986, the plaintiff Kenneth MacDonough was employed by MHFA[3] as an assistant real estate appraiser on an at-will basis at the (final) annual salary of $37,548. Craigie Arms Associates, the developer of a project called Craigie Arms, located a few street blocks from Harvard Square, Cambridge, had filed an application through its general partner, Robert H. Kuehn, Jr., to increase by some $600,000 a previously approved mortgage application for about $3,500,000. Joseph Antonelli, the plaintiff's supervisor, asked the plaintiff to do a review, and to compare the values in the earlier independent appraisal of the project with those in the application for the increase. The plaintiff's written report of October 24, 1985, indicated that the proposed rents for the fifty apartment units were suitable in light of the anticipated yearly subsidy from the State Housing Assistance for Rental Production (SHARP), see G. L. c. 121B, §§ 33-35.[4] The report did not point to any

---

[2] In six additional counts, the plaintiff complained of a variety of things — intentional infliction of mental distress, discrimination based on religious affiliation or moral code, breaches of civil service and conflict of interest laws; violation of the MHFA's enabling statute. The judge also found implicit in the complaint a defamation claim. That claim and the two urged here the judge disposed of on summary judgment; the rest of the complaint he dismissed for failure of statement under Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974).

[3] MHFA is an independent corporate and political body which promotes an increase in the supply and availability of decent, safe, and sanitary housing for low and moderate income families and individuals.

[4] A SHARP subsidy works to reduce interest requirements on mortgages which finance new construction or substantial renovations for projects devoted to a certain amount of low income housing.

problems with the rent level proposed for office space that was to be made available in the basement level of the building.

However, on the following day, October 25, the plaintiff wrote a "confidential" letter to Bernard Singer, chairman of the board of directors of MHFA. He said that Kuehn intended to move a company of his into about 8,000 square feet of the commercial space at Craigie Arms and to pay rent of $15 per square foot. The plaintiff thought at least $30 would be "more realistic"; and if fair, rather than arbitrarily deflated rent was paid on such space, no SHARP subsidy would be necessary. Because of Kuehn's "relationship with M.H.F.A." a "serious ethical" question, "[p]ossibly, a criminal one?," arose. With so many MHFA insiders aware of the deal, outsiders would eventually know about it: from an ethical and political standpoint MHFA was "opening itself up to a disastrous situation." The plaintiff hoped Singer would inform all board members — the December board meeting was near — and "derail this potential disaster before it takes place."

Singer forwarded the letter to the MHFA executive director, Marvin Siflinger, who on November 12, 1985, sent it to the chief of operations, Eleanor G. White. Regular processing of the application was stopped. On November 14, White, Antonelli, Brian Frawley (Antonelli's supervisor), and the plaintiff met, and on November 18, White addressed a memorandum to the plaintiff summarizing her initial view of the plaintiff's behavior as follows. Any doubts or information he had about the commercial rents should not have been withheld from his superiors; it should have been passed through the regular chain of command; the withholding risked a situation where a given problem might not have been attacked before the open board meeting; White inferred that the plaintiff intended to embarrass the staff in its relation to the chairman or the public. Furthermore, the plaintiff had made "unsupported accusations about ethical and/or criminal lapses in the supervisory staff" and thereby had done a disservice to his colleagues and supervisors: if he had evidence

28 Mass. App. Ct. 538                                        541

Macdonough v. Board of Directors of Massachusetts Housing Finance Agency.

of wrongdoing he should provide it to the law enforcement authorities. "To the extent that you make mistakes, withhold information (as in Craigie Arms), or overlook substantive issues, Agency decision making is severely compromised."[5]

As White promised in her memorandum, the MHFA took prompt steps to investigate the plaintiff's assertions. The real estate appraisal and consultant firm of Casey & Dennis was retained to conduct an independent appraisal; another assistant appraiser at MHFA was assigned to evaluate the commercial rent levels obtainable at Craigie Arms; the developer was invited to submit additional information on commercial rents; and the plaintiff himself was requested (by Antonelli) to review commercial rent levels in the Harvard Square area.

The plaintiff after conducting a review submitted a memorandum to Antonelli on November 21, 1985, in which he said that even if the commercial space was not used for occupancy by retail businesses, which he considered its best and highest use, the rent (for office use) should be $25 per square foot. But as the commercial space involved was actually space in the basement which hardly qualified for retail business, Antonelli asked the plaintiff for further substantiation. On December 9, 1985, the plaintiff turned in a second memorandum; now he concluded that $24 was the proper rate even for office use. The evaluations by the others who had been asked to review the matter were to the effect that $13-15 was the proper office rent. Antonelli concluded that the plaintiff's evaluation was unsupported. Antonelli so informed the plaintiff by memorandum of January 13, 1986: the plain-

---

[5]At some point after the Singer letter, the plaintiff's then attorney filed a complaint with the State Ethics Commission. The present record leaves the circumstances obscure, but it appears that the commission conducted a preliminary investigation; it found no probable cause for further investigation or hearing.

542                                  28 Mass. App. Ct. 538

MacDonough *v.* Board of Directors of Massachusetts Housing Finance Agency.

tiff had not been objective; he "selectively us[ed] comparables" to try to justify what he had written Singer.

As to the plaintiff's suggestion of ethical or criminal implications in MHFA dealings with Kuehn, we note: Kuehn was chairman of the Multi-Dwelling Advisory Board of MHFA. MHFA's enabling act, St. 1966, c. 708, § 11, exempts individuals, like Kuehn, who are serving on its advisory boards, from the provisions of the conflict of interest statute, G. L. c. 268A. Kuehn was free to apply for financing for his construction projects through MHFA.

To go backward in time, the record indicates that the plaintiff's performance on his job had been deteriorating since 1984 when he was denied a merit raise. It declined further after Antonelli's assessment of January 13. The plaintiff was to have his semi-annual performance assessment in January 1986, but Antonelli postponed this and on January 31 he set up a sixty-day action plan for the plaintiff to go into effect in February 1986.[6] It outlined particular tasks for the plaintiff to accomplish on three projects (Belle Street Apartments, Springfield; Brickyard Terrace, North Adams; Haynes House, Roxbury) to be completed by given deadlines. The plaintiff in fact only worked on the Belle Street Apartments project. The appraisal for this project was to be completed by March 3, 1986. The plaintiff, however, did not turn in his first version of the appraisal until April 1, 1986. Revisions were recommended, but the plaintiff's appraisal submitted on April 24, 1986, did not adopt these revisions. The plaintiff also spent several days during this period establishing attainable rents for an Oak Hills development in Pittsfield. This project was not part of the sixty-day action plan.

On April 10, 1986, Antonelli made the performance assessment. He graded the plaintiff's work as "unacceptable" in the categories of (1) "workload management," (2) "communication and coordination," and (3) "initiative and responsiveness"; and "needs improvement" in the category of

---

[6]The plaintiff refused to assent by signing his name to the plan. Nevertheless, it was Antonelli's directive to him.

(4) "technical skills and problem solving." On May 8, Antonelli forwarded to Siflinger a recommendation that the plaintiff be discharged, with an accompanying assessment of the plaintiff's performance. This was on the lines of the April 10 assessment, but went into greater supporting detail. In category (1), Antonelli found failure to meet deadlines, improper reliance on others' work, and excessive absenteeism and tardiness; under (2), there was misconduct, including the episode of the letter of October 25, 1985, as to which Antonelli wrote: "Although a proper chain of review for such allegations is in place within the Agency and is expected to be followed, [the plaintiff] refused to utilize that process. Rather than bring this matter up with me, he went directly to the Agency Chairman. I want to emphasize here that [the plaintiff's] allegations have since been proven completely erroneous and unfounded." Under category (3), Antonelli found insubordination, in that the plaintiff refused to accept in a professional manner any direction or constructive criticism from higher authority; he reacted to such communications as personal attacks upon himself. Regarding (4), while the plaintiff had the basic skills, he had not applied them as could be expected of one with such length of service. There was a lack of initiative to solve problems on an independent basis.

With the concurrence of Frawley, White, and Siflinger in this review of the plaintiff's performance, the plaintiff was dismissed on May 9, 1986.

2. *Discussion.*

(a) *In general.* The measure of the case is that the plaintiff was dismissed from service for substandard performance as an assistant real estate appraiser, in which the letter of October 25 figured, if at all, only as an example of that kind of performance, being erroneous in its assertions and disruptive in the manner of its presentation. If, as appears, the plaintiff's inefficiency or incompetence was the MHFA's reason for the discharge, then the case is well on its way to solution. Nevertheless, we deal more particularly with the plaintiff's two contentions.

(b) *Constitutional claim.* To succeed on a constitutional basis, one in the plaintiff's position must show initially that (i) his conduct was constitutionally protected, and (ii) this conduct was a motivating factor in his discharge by the employer. If a plaintiff carries this burden, a defendant, to escape liability, must show in turn that the decision to dismiss the plaintiff would have been reached without regard to the protected conduct. See *Brasslett* v. *Cota,* 761 F.2d 827, 835 (1st Cir. 1985), citing *Pickering* v. *Board of Educ. of Township High School Dist. 205, Will County,* 391 U.S. 563, 568 (1968).

The prime question whether an employee's conduct is the subject of constitutional protection is submitted to a "balancing" process — "the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern[7] [as against] the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568. See also *Brasslett,* 761 F.2d at 834-835. Thus *McDonough* v. *Trustees of the Univ. Sys. of N.H.,* 704 F.2d 780, 784 (1st Cir. 1983), says in summary:

> "Allegedly protected activity must be evaluated with an eye toward: (1) whether it was directed against those with whom plaintiff is regularly in contact such that it might impede harmony among co-workers or the ability of supervisors to maintain discipline; (2) whether plaintiff's activity has a detrimental impact on those with whom he must maintain personal loyalty and confidence for the fulfillment of his job responsibilities; and (3) with regard to erroneous statements concerning matters

---

[7] It may be doubted whether the letter to Singer qualifies, in the *Pickering* sense, as a comment on a matter of public concern; rather it may be viewed as comment on an internal management question. Of course the letter was not directed to the public. Compare *Mount Healthy City Bd. of Educ.* v. *Doyle,* 429 U.S. 274, 283-284 (1977). Sometimes the plaintiff in his argument invokes a right to call attention to his employer's violation of State law, sometimes — with even less record support — a right to protest his being personally coerced by superiors into engaging in unethical or illegal conduct.

of public concern, whether such statement impedes plaintiff's performance of his daily duties or the regular operation of the [agency] generally."

Deserving particular attention here are the several references of the plaintiff's superiors to the effects of the episode of the Singer letter on internal discipline, loyalty, and confidence among the plaintiff's coworkers, upon the plaintiff's performance, and upon general operation of the Agency. The judge below found that the "balance" fell in favor of the Agency, and we do the same upon independent appraisal unaided by the "clearly erroneous" standard of Mass.R.Civ.P. 52(b), 365 Mass. 816 (1974).

Although unnecessary to decision, we point out that, were it assumed that the letter to Singer was the subject of constitutional protection, the plaintiff would nevertheless fail in the end on the issue of the employer's motivation in discharging him. The assessments showed the plaintiff's performance to be unacceptable apart from the sending of the letter. We add that we do not think the MHFA would be barred by the Federal or State Constitutions from considering the rashness of the content and manner of communication of the letter as having some bearing on the plaintiff's proficiency as a worker. But in any event that consideration does not appear to have figured substantially in the final action.

(c) *Common law claim.* In *DeRose* v. *Putnam Mgmt. Co.,* 398 Mass. 205, 206 (1986), the court answered in the affirmative the question "whether an employee at-will may resort to the courts for a remedy if the employee at-will is dismissed in violation of public policy in circumstances in which the employer does not deprive the plaintiff of any bonuses, wages, or commissions." Under the title of "public policy," "[r]edress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." *Smith-Pfeffer* v. *Superintendent of the Walter E. Fernald State School,* 404 Mass. 145, 149-150 (1989).

The plaintiff says that for the MHFA to discharge him because he brought the Kuehn matter to Singer's attention offended "public policy." But the case in the plaintiff's own light does not fall within the established public policy categories above described. If a new category were to be established, and dismissal of an at-will employee forbidden when motivated by "his performance of some act so socially desirable that public policy would encourage it," *Glaz* v. *Ralston Purina Co.*, 24 Mass. App. Ct. 386, 390 (1987), still the plaintiff's actual performance of the "act" in the present case would not come near the hypothetical level of social desirability. See *Yovins* v. *Fish*, 27 Mass. App. Ct. 442, 444-445 (1989). However, the entire discussion of "public policy" is irrelevant because the dismissal here was essentially for incompetence as we have indicated.[8]

*Judgment affirmed.*

---

[8]The case of *Mello* v. *Stop & Shop Cos.*, 402 Mass. 555, 560 n.6 (1988), assumes the possibility of protecting at-will employees against discharge for so-called "whistleblowing." However that kind of communication might be defined, the protection would not be expected to extend to a recklessly false charge or imputation, even if uttered in a belief that it was true.