AETNA CASUALTY SURETY COMPANY, Plaintiff–Appellee,

v.

P & B AUTOBODY, et al., Defendants–Appellees.

Arsenal Auto Repairs, Inc., et al., Defendants–Appellants.

AETNA CASUALTY SURETY COMPANY, Plaintiff–Appellee,

v.

RODCO AUTOBODY, et al., Defendants–Appellees.

Betty Arhaggelidis, Defendant–Appellant.

AETNA CASUALTY SURETY COMPANY, Plaintiff–Appellee,

v.

P & B AUTOBODY, et al., Defendants–Appellees.

Betty Arhaggelidis, Appellant.

Nos. 93–1877 to 93–1881, 93–2209, 93–2300, 93–1903 and 93–2257.

United States Court of Appeals, First Circuit.

Heard Aug. 4, 1994.

Decided Dec. 29, 1994.

See also 138 F.R.D. 328.

William F. Spallina, with whom Carol A. Molloy was on brief, for defendants Arsenal Auto Repairs, Inc., et al.

Kenneth R. Berman, with whom David A. Guberman and Sherin and Lodgen, were on brief, for defendant Jack Markarian.

James P. Duggan, Alfred E. Nugent, John G. Lamb, Flynn, Hardy & Cohn, Giovano Ferro II, Ferro, Feeney, Patten & Galante, Daniel T. Sheehan, Ralph Stein, Edward G. Ryan, Ahmad Samadi, Joseph S. Carter, William D. Crowe, Crowe, Crowe & Vernaglia and Abdullah Swei, for defendants P & B Autobody, et al.

David S. Douglas and David O. Brink, with whom Howard S. Veisz, Kornstein Veisz & Wexler, Glenda H. Ganem and Smith & Brink, were on brief, for plaintiff-appellee Aetna Cas. and Sur. Co.

Before TORRUELLA, Chief Judge, BOUDIN, Circuit Judge, and KEETON,* District Judge.

KEETON, District Judge.

This case concerns an alleged widespread fraudulent scheme, involving five automobile body shops and two insurance claims adjusters. The purpose of the scheme was to obtain payments on fraudulent insurance claims.

Seven appellants, defendants in the trial court, challenge on numerous grounds the final judgment entered after a jury trial. The judgment was for Aetna Casualty and Surety Company ("Aetna") against

(a) Betty Arhaggelidis on the theory of civil conspiracy in the sum of $373,857.28 plus interest from October 2, 1989 to the date of entry of judgment;

(b) the Tirinkians and the Markarians (the five individual "Arsenal defendants") for $3,859,901.72 (consisting of damages of $789,-967.24 trebled to $2,359,901.72 under 18 U.S.C. §§ 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and costs, expenses, disbursements and attorneys' fees of $1,500,000.00) together with prejudgment interest from October 2, 1989 to the date of entry of judgment;

(c) three of the Arsenal defendants (Zareh Tirinkian, Peter Markarian, and Jack Markarian) for a separate and irreducible penalty of $1,579,934.48 under Mass.Gen.L. ch. 93A in addition to the amount set forth in (b); and

(d) Arsenal Auto Repairs, Inc. ("Arsenal Auto"), a separate defendant in the action,

* Of the District of Massachusetts, sitting by designation.

for the sum of $789,967.24 on a claim of civil conspiracy plus interest from October 2, 1989 to the date of entry of judgment.

For the reasons that follow,[1] we affirm.

## I. BACKGROUND

We begin this Opinion with a summary of facts as the jury might have found them; we view the evidence in the light most favorable to the verdicts. *See United States v. Rivera–Santiago*, 872 F.2d 1073, 1078–79 (1st Cir.), *cert. denied*, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989).

One of the body shops, Rodco/P & B Autobody, was owned and operated by defendant Petros Arhaggelidis, who has not appealed the judgment against him. He is the husband of appellant Betty Arhaggelidis. She was the owner of two Mercedes upon which six fraudulent claims were made to Aetna.

Another of the body shops, Arsenal Auto (also an appellant in this action), was owned and operated by appellant Zareh Tirinkian. His wife, Lena Tirinkian, and her brothers John Markarian and Peter Markarian were employees of Arsenal Auto during the period of the alleged fraudulent scheme.

Tarja Markarian and her husband Peter Markarian were the co-owners of a Mercedes upon which two fraudulent claims were made to Aetna.

From 1987 to 1989, the Arsenal defendants, together with employees and friends, submitted sixteen fraudulent insurance claims to Aetna involving luxury automobiles. Aetna paid $137,346.83 on these claims. The Arsenal defendants filed at least ten additional fraudulent claims with other insurance companies on the same group of cars. The Tirinkians submitted a total of fifteen fraudulent claims (seven to Aetna) upon which either Lena or Tareh Tirinkian was the claimant or the insured. Peter and Tarja Markarian submitted four fraudulent claims (two to Aetna) on their Mercedes. John Markarian, who filed no claims in his own name, was the

supervisor of repairs at Arsenal Auto, where most of the cars involved in the fraudulent claims were stored and purportedly repaired.

Timothy Cummings and Steven Dexter were two of the many Aetna appraisers who covered the area where Arsenal Auto and the other body shops were located. Either Cummings or Dexter did the appraisal for ten of the sixteen fraudulent claims that the Arsenal defendants (personally or in cooperation with their friends) filed over a three-year period commencing in 1987. Cummings and Dexter submitted false appraisals to help the Arsenal defendants defraud Aetna.

In the district court, judgment was entered by default against Cummings and Dexter under RICO for $789,967.24 (being the amount paid out by Aetna on 112 insurance claims submitted to Aetna that the jury found to be fraudulent) trebled to $2,359,-901.72 plus interest at 12% per annum from October 2, 1989 on the trebled amount, plus $1,500,000 in costs, disbursements, and attorneys' fees.

For each of the sixteen fraudulent claims directly involving the Arsenal defendants and friends cooperating with them, Aetna, in accordance with its business practices, required a completed work form to be submitted by the claimant. At trial, the Arsenal defendants did not provide any documentation that Arsenal Auto or any other autobody shop completed any of the repairs in connection with any of the claims. With respect to some claims, the evidence shows that the claimed accidents never occurred; in other cases, the claimed damage was intentionally inflicted. The jury may have supportably inferred that in some cases defective parts were placed on the cars for the purpose of appraisal and then later replaced with the original parts.

The jury found that each of the individual Arsenal defendants was liable for a substantive RICO violation under § 1962(c) for participating in the affairs of Aetna through a pattern of racketeering activity. The jury also found all of the individual Arsenal defen-

---

1. The published version of this Opinion includes only the background statement of facts (Part I) and discussion of those issues that may be of general interest (Parts II–IX and Conclusion). The remaining portions of the Opinion (Parts X–

XIV) contain a detailed explanation of the sufficiency of the evidence to support the jury findings and address other issues that do not appear to have precedential importance. *See* First Cir.R. 36.2.

dants liable, under § 1962(d), for RICO conspiracy with the adjusters and the operators of other body shops (not including Betty Arhaggelidis).

The judgment against the Arsenal defendants was in the same amount, and on the same calculus, as that against Cummings and Dexter, explained above.

Appellant Betty Arhaggelidis was associated with the fraudulent scheme through her husband, the owner of Rodco/P & B Autobody, one of the five autobody shops involved. Betty Arhaggelidis owned two Mercedes, one of which was registered in her mother's name. These two Mercedes were involved in six fraudulent claims, as to all of which Cummings did the appraisal. The jury found that she was liable under a "civil conspiracy" theory centered around Rodco/P & B Autobody, and therefore was liable in connection with thirty-seven fraudulent claims.

The appellants challenge the judgments entered against them on a variety of grounds. In addition, each appellant, except for Arsenal Auto Repairs, Inc., appeals the district court's denial of his or her motion for judgment as a matter of law because of insufficiency of the evidence.

First we consider the issues arising from the relationships among the RICO counts and the civil conspiracy count, then we consider other issues raised by one or more of the appellants.

## II. RELATIONSHIPS AMONG COUNTS OF THE AMENDED COMPLAINT

Appellants, at various points, both in oral argument and in briefs before this court, have seemed to suggest that the judgment against them in this case is somehow flawed because of some aspect of the relationships among the different theories alleged and tried before the jury. We address specific aspects of this suggestion in Part III, *infra.* We address the suggestion more broadly here.

The district court considered five different theories (asserted in five different counts) that are relevant to this inquiry: three claims of RICO substantive violations, one claim of RICO conspiracy, and one non-RICO conspiracy claim.

*First.* Count VII, a RICO substantive violation under § 1962(c) alleging an association-in-fact enterprise. This theory was dismissed from the case in the trial court.

*Second.* Count VIII, a RICO substantive violation under § 1962(c) alleging Aetna as the enterprise. The jury found that this claim was proved against all individual Arsenal appellants.

*Third.* Count VI, a RICO substantive violation under § 1962(c), alleging Arsenal Auto as the enterprise. The jury found that this claim was proved against all individual Arsenal appellants.

*Fourth.* Count IX, alleging a RICO conspiracy under § 1962(d). The jury found that this claim was proved against all individual Arsenal appellants.

*Fifth.* Count X, common law civil conspiracy. The jury found that this claim was proved against all the appellants, including Arsenal Auto and Arhaggelidis.

The judgment against the individual Arsenal appellants jointly and severally in the amount of $2,359,901.72 is supported by the jury's finding of liability on Counts VIII and IX. Therefore, if we determine that *either* the finding on Count VIII or that on Count IX is supported by sufficient evidence, the judgment must stand. In fact, as we explain below, we find that the evidence was sufficient for the jury reasonably to find liability on *both* Count VIII (the RICO substantive violation with Aetna as the enterprise) and Count IX (the RICO conspiracy).

The Arsenal appellants do not challenge the sufficiency of the evidence in support of the jury's finding of liability on Count VI or on Count X. The only argument raised by appellants with respect to Count VI is an argument regarding pleading deficiency that we have rejected as wholly without support. Moreover, because we have determined that the judgment against the individual Arsenal appellants is supported by jury findings on Count VIII and Count IX, we have no reason to consider whether appellants are independently liable under Count VI, Count X, or both.

The judgment against Arsenal Auto Repairs, Inc. which is also an appellant in this action, is supported by the jury's finding of liability on Count X, the civil conspiracy theory. Arsenal Auto has not challenged the sufficiency of the evidence supporting the jury's finding with respect to its liability under Count X. The judgment against Arsenal Auto is affirmed for the reasons stated in other parts of this Opinion.

The judgment against appellant Arhaggelidis is supported by the jury's finding of liability on Count X, the civil conspiracy theory. We conclude that the evidence was sufficient to support the jury's finding against Arhaggelidis on Count X.

From this summary, it is clear that one of appellants' assertions is true: the relationships among transactions, defendants, and legal claims are complex both legally and factually. A question remains, however, as to how, if at all, any of those complexities or all of them taken together bear upon any of the issues before this court on appeal.

Nowhere in the trial record, or in their briefs before this court, except in a passage from their brief that is quoted in Part III, *infra,* and an argument that the consolidated case was too complex for a jury to understand, App. Brief at 59–61, did the appellants ever clearly formulate an argument or set of arguments based upon their hints and innuendos about complexity.

Nevertheless, we have read with special care all parts of the briefs containing such hints or suggestions. We have done so, first, to be certain we have not overlooked any argument presented and, second, to assure that we have taken into account any cited cases that might bear upon the issues presented by a fact pattern as complex as that before us, with interlocking personal, family, and institutional relationships.

Entirely apart from the complexities added by RICO, a risk of confusion has long existed because of relationships among different legal and factual theories of conspiracy that might be invoked by the parties or by a court. The law bearing upon the potential consequences of invoking different theories of conspiracy is more extensively developed in criminal cases than in civil. Even with respect to the criminal context, however, relevant statutes and precedents provide only limited guidance for structuring factual and legal analysis.

In criminal cases, issues arise often with respect to whether a case should be viewed as one involving:

(1) a single conspiracy of many parties, multiple objectives, and broad sweep;

(2) multiple independent conspiracies; or

(3) a nest of interlocking conspiracies that may involve overlapping conspiracies or smaller, discrete inner conspiracies of fewer persons and smaller scope that are tied in with a larger conspiracy whose members include some but not all of the members of the discrete inner conspiracies.

*See, e.g., United States v. Glenn,* 828 F.2d 855 (1st Cir.1987).

One result of this range of possible interpretations of the evidence in a particular case is that a question concerning legal theory and arguments based upon it, and concerning instructions explaining the law to the jury, is difficult and "is probably not susceptible to an abstract answer unrelated to context."

*United States v. Oreto,* 37 F.3d 739, 748 (1st Cir.1994).

The persons alleged to be RICO conspirators and civil conspirators in the present case, like those charged under a non-RICO conspiracy theory in *Oreto*

> have engaged in a series of transactions that could be viewed as a set of separate conspiracies, or one overall conspiracy embracing numerous wrongful transactions, or ... both an overarching conspiracy and a nest of underlying smaller conspiracies. Partly this is a problem of proof and inference; partly the problem arises from trying to squeeze into the conceptual cubbyhole of "an agreement" activities that in practice often have the more shapeless character of an evolving joint criminal enterprise.

*Id.* at 748–749 (citations and reference to double jeopardy omitted);

*see also United States v. Sepúlveda,* 15 F.3d 1161, 1191 (1st Cir.1993), [*cert. de-*

*nied,* —— U.S. ——], 114 S.Ct. 2714 [129 L.Ed.2d 840] (1994) ("[T]he fact that the organization's methods and tactics evolved over time did not dictate a finding of two, three, or four separate conspiracies.").

In a criminal context, the prosecutor is allowed some choice of theory, though the choice may be burdened with consequences, including those incident to the law of double jeopardy.

In a civil context, likewise, parties may be allowed some choice of theory. But the choice, in the civil context also, may be burdened with consequences—a point to which we return below.

In this case, added layers of complexity incident to relationships among theories exist, not only because of the relationships between different conspiracy counts—Count IX (RICO conspiracy) and Count X (civil conspiracy)—but also because of the relationships among these counts and the counts alleging RICO substantive violations (Counts VII and VIII). Also, as in criminal cases, *see, e.g., Oreto,* 37 F.3d at 748, an answer as to what significance, if any, the legal and factual theories may have, must be context sensitive.

■ Because procedural law allows alternative contentions, parties to a civil action involving such an array of factual and legal theories as this case presents may be allowed to defer choice at least until late stages of proceedings in the trial court. For example, both plaintiffs and defendants in a civil case may be allowed to maintain alternative contentions at least until the evidence is closed, when the court may require some choices to be made about the form of verdict to be used in submitting the case to the jury—*see* Fed. R.Civ.P. 49—and about instructions to the jury. When a party does not request either a "special question" or an instruction submitting a particular theory of conspiracy to the jury, that party makes a choice that has the associated consequence of almost certainly precluding the assertion after verdict of the omitted theory of conspiracy. *See, e.g.,* Fed. R.Civ.P. 49. The law (a procedural rule, in this instance) allows choice, but it may limit the scope of choice by defining consequences that are attached to each of the available

options, rather than allowing complete freedom of choice. A party making a choice of this kind, among legally defined options only, is making an "election" in the classic sense. *See* John S. Ewart, *Waiver or Election,* 29 Harv.L.Rev. 724 (1916).

■ Of course, a trial court may in some circumstances allow submission to a jury of two or more theories, with appropriate instructions explaining as to each theory the factual elements the jury must find to return a verdict sustaining that theory. The different theories submitted to a jury may be factually compatible—that is, a verdict sustaining all theories submitted may be permissible. Also, however, the evidence and the different theories of conspiracy submitted to a jury in a particular case may be so factually incompatible that the jury's choice is limited to finding one or another of the theories supported, but not all.

In the present case, the trial judge, in submitting the case to the jury, used a verdict form that at first glance might appear to be a submission on "special questions," with no "general verdict," under Fed.R.Civ.P. 49(a). · Closer examination, however, of both the verdict form and the record of colloquies about it, discloses that the court required only a general verdict of the jury, under Fed.R.Civ.P. 49(b), as to each claim against each defendant, after elimination of claims that were alleged but as to which either the court rejected the claim as a matter of law (the association-in-fact conspiracy theory alleged in Count VII) or Aetna elected not to request submission to the jury.

The submission of a separate question requiring the jury to report an answer as to each of at least 122 of the 176 allegedly fraudulent claims was necessary because disputed factual issues were presented not only with respect to whether an alleged RICO conspiracy and the alleged RICO substantive violations existed, and, if so, what defendants were liable under each theory, but also with respect to whether each of the transactions was within the scope of the conspiracy or substantive violation. The answers have a bearing on the terms of the judgment to be entered, even though the trial judge deter-

mined (supportably, we have concluded) that no genuine dispute of fact existed as to the amount paid by Aetna on each of the 112 claims the jury found to be fraudulent.

In summary, we conclude that the verdicts and judgment for plaintiff against the appellants are supported by the evidence received in this case, and by law.

## III. SUFFICIENCY OF PROOF

### A. Standard of Review

Appellants challenge the sufficiency of the evidence to support the judgment entered against them. They argue that the district court should have granted their motions for judgment as a matter of law.

The district court may grant a motion for judgment as a matter of law only if, after examining the evidence and all reasonable inferences therefrom "in the light most favorable to the nonmovant," it determines that "the evidence could lead a reasonable person to only one conclusion," favorable to the movant.

Gallagher v. Wilton Enterprises, Inc., 962 F.2d 120, 124 (1st Cir.1992) (quoting Hendricks & Associates, Inc. v. Daewoo Corp., 923 F.2d 209, 215 (1st Cir.1991)). A denial of judgment as a matter of law is "reviewed de novo, which means that we use the same stringent decisional standards that control the district court." Id. at 125.

With respect to the five individual Arsenal defendants, appellee argues that the judgment in the amount of $2,369,901.72 is supported, independently, by each of two jury findings—first, the finding that all individual Arsenal defendants are liable on a theory of RICO substantive violation with Aetna as the enterprise under § 1962(c) (Count VIII) and, second, the finding that all individual Arsenal defendants are liable on a theory of RICO conspiracy under § 1962(d) (Count IX). With respect to defendant Betty Arhaggelidis, the appellee argues that the judgment in the amount of $373,857.28 is supported by the jury finding that she was liable on a theory of civil conspiracy. We examine the evidence supporting each of these theories

against each defendant in Parts III.C, III.D, and III.E, infra.

### B. Appellants' Preclusion Argument Based on the Relationship of Count VII to Other Counts

The appellants challenge the district court's denial of their motion for judgment as a matter of law on Count VIII, the RICO substantive charge alleging Aetna as the enterprise, and Count IX, the RICO conspiracy charge. They contend that once the district court granted defendants' motion for judgment as a matter of law on Count VII (the RICO substantive violation alleging an association-in-fact enterprise including all defendants), the district court should have granted, also, defendants' motion for judgment as a matter of law on Counts VIII and IX. (This argument was not made in the trial court as to defendants' motion for judgment as a matter of law on Count VI, nor is it asserted on appeal. Count VI, alleging Arsenal Auto as the enterprise, alleges a scheme of a smaller scope than that alleged in Count VII. Thus, no plausible argument can be made that the court's dismissal of Count VII requires the dismissal of Count VI.)

Appellants do not clearly state the legal premises of their preclusion argument. Reading generously to appellants, however, to assure that we address any contention that might even plausibly be presented, we infer that some asserted principle of preclusion is at least implicitly if not explicitly suggested. For example, appellants say:

The trial judge's ruling directing a verdict for all Defendants on Count VII of the Complaint, because there was "insufficient evidence to sustain Count 7, an overall association-in-fact enterprise," (App. 4092), separated the Arsenal Defendants from the other Defendants in the case and thereby disassociated [sic] the actions of the Allston Group from the acts of the Arsenal Defendants. Without the association-in-fact enterprise to meld the acts of the various Defendants into an overall conspiracy, the link between the Arsenal Defendants and the Allston Group was severed thereby absolving the Arsenal Defendants from any wrongdoing concerning

bribery. As such, the trial judge's ruling, by implication, absolved the Arsenal Defendants from bearing the burden of the Allston Group's bribery.

Appellants' Brief at 41–42.

It is true that each of Counts VII, VIII, and IX alleges a fraudulent scheme that includes all the body shops. These three theories have the same "scope" in the sense that each of them would support the judgment against the Arsenal individual defendants in the amount of $2,369,901.72. Nevertheless, each count asserts a distinctive theory, and none of the three theories has all of the elements of any other of the three. Counts VII and VIII allege RICO substantive violations under § 1962(c), but the entities alleged as the enterprise are different. In contrast to these *substantive* violations, Count IX alleges a RICO *conspiracy* under § 1962(d).

■ Since each of the three counts requires different elements of proof, the appellants are incorrect when they say that the dismissal of one of these counts, namely Count VII, *requires* the dismissal of one or both of the other two counts.

Although the appellants' argument fails as a matter of law, we proceed to consider the possibility of some other implicit premise that may have led to such a patently incorrect statement of law.

■ One premise that may be inferred from appellants' argument is that in order to prove Count VIII, the RICO substantive violation with Aetna as the enterprise, the plaintiff had to prove the same relationships between the defendants that were essential to the association-in-fact enterprise alleged in Count VII. This assumption is incorrect.

■ Section 1961 defines an "enterprise" for the purposes of RICO to include "any individual, partnership, corporation ... or other legal entity, and any union or group of individuals associated-in-fact although not a legal entity." 18 U.S.C. § 1961(4). Thus to satisfy the "enterprise" element of a RICO substantive violation, a plaintiff may prove either the existence of a legal entity, such as a corporation, *or* that a group of individuals were associated-in-fact. Since Aetna is a corporation, Aetna can constitute an "enterprise" for the purpose of Count VIII, even if there is no proof of an association-in-fact enterprise.

In contrast, Count VII requires proof of an association-in-fact enterprise. An association-in-fact enterprise is an "ongoing organization," with members "function[ing] as a continuing unit," which is "separate and apart from the pattern of racketeering in which it engages." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2529, 69 L.Ed.2d 246 (1981).

Since no party has challenged the district court's grant of the defendants' motion for judgment as a matter of law on Count VII, we need not determine the precise elements required for a plaintiff to prove an association-in-fact enterprise. Nevertheless, it is clear that an association-in-fact enterprise is different from an enterprise that is a legal entity, like Aetna. Since different proof is required to establish these different kinds of an enterprise, the court's determination as a matter of law in favor of the defendants on Count VII is consistent with the court's determination that fact issues remained for the jury to decide with respect to Count VIII.

■ Another possible premise, which is not explicitly articulated or acknowledged by the appellants, is that in order to prove a RICO conspiracy of the scope alleged in Count IX, the plaintiff was required to prove the existence of an association-in-fact enterprise of that same scope.

This premise is not valid. Section 1962(d) does not require proof of an association-in-fact enterprise. Any enterprise meeting the definition of enterprise in § 1961 will do. Under § 1961 an enterprise may include a legitimate legal entity like Aetna as the victim of the racketeering activity. This court has previously upheld convictions under both § 1962(c) and § 1962(d), that alleged a victim enterprise like Aetna.

*See United States v. Boylan*, 898 F.2d 230 (1st Cir.), *cert. denied*, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990) (victim enterprise was the Boston Police Department).

Therefore, in order to satisfy the enterprise element of a RICO conspiracy of the scope alleged in Count IX, the plaintiff needed only to prove some kind of enterprise of that scope, not necessarily an association-in-fact enterprise. In the case at hand, proving a RICO conspiracy with Aetna as the enterprise was sufficient.

For these reasons, the trial judge's ruling as a matter of law for defendants on Count VII, based on the conclusion that there was not enough evidence to go to the jury on the theory of an "association-in-fact" enterprise, is entirely consistent with the jury findings of a § 1962(c) substantive violation (with Aetna as the victim enterprise) and of a § 1962(d) conspiracy (with Aetna as the victim enterprise).

### C. Substantive RICO Violation Under § 1962(c) with Aetna as the Enterprise—Count VIII

 For an individual defendant to be liable for a RICO substantive violation under § 1962(c), with Aetna as the enterprise, the evidence must be sufficient for the jury to find that (1) Aetna was an enterprise affecting interstate or foreign commerce, (2) that the defendant under consideration associated with the enterprise, (3) that this defendant participated in the conduct of the enterprise's affairs, and (4) that this defendant's participation was through a pattern of racketeering activity. 28 U.S.C. § 1962(c).

We consider, whether the evidence was sufficient to prove each of these elements against each of the defendants the jury found liable under Count VIII.

 *First Element.* Aetna is an "enterprise affecting interstate commerce" within the meaning of § 1962(c). The major purpose of RICO is to protect legitimate business enterprises from infiltration by racketeers. "Enterprise" as used in this act, includes legitimate corporations. *See United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Since Aetna is a major property and casualty insurer doing business in many states, Aetna's conduct of its business "affects interstate commerce."

*See United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944) (a fire insurance company that conducts a substantial part of its business transactions across state lines is engaged in "commerce among the several states" and is subject to regulation under the Commerce Clause).

 Appellants argue that Aetna cannot constitute the "enterprise" because the alleged racketeering activities were to the detriment and not the benefit of Aetna. This argument rests on a misinterpretation of the RICO statute. The statute does not require that the pattern of racketeering be in furtherance of the enterprise. In *United States v. Boylan,* this court upheld the convictions of Boston police detectives who violated RICO by illegally participating in the affairs of the Boston Police Department (the enterprise), through a pattern of racketeering by accepting bribes. *Boylan,* 898 F.2d 230. In *Boylan,* as in this case, the affairs of the enterprise were undermined by the illegal activity.

*See also Yellow Bus Lines, Inc. v. Drivers Chauffeurs & Helpers Local Union 639,* 913 F.2d 948, 952 (D.C.Cir.1990), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991) ("Section 1962(c) nowhere requires proof regarding the advancement of the enterprise's affairs by the defendant's activities or proof that the enterprise itself is corrupt. . . .");

*United States v. Provenzano,* 688 F.2d 194 (3rd Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982) (RICO is not limited to racketeering activities that advance or benefit the enterprise, but also encompasses racketeering activities that work to the detriment of the enterprise).

 *Second Element.* Appellants, who are not employees of Aetna, attempt to distinguish *Boylan* by pointing out that in *Boylan* the defendants were employees of the organization that constituted the RICO enterprise. Appellants argue that the statute prohibits employees from conducting an enterprise's affairs through a pattern of racketeering activity to the detriment of the enterprise, but does not prohibit persons who are

merely associated with the enterprise from conducting the enterprise's affairs to its detriment through a pattern of racketeering activity.

The proposed distinction is not supported by the language of the statute, which refers to "person[s] employed by or *associated with* any enterprise." 18 U.S.C. § 1962(c) (emphasis added). Nor is it supported by any identifiable public policy or by precedent.

*See, e.g., United States v. Yonan,* 800 F.2d 164 (7th Cir.1986) *cert. denied,* 479 U.S. 1055, 107 S.Ct. 930, 93 L.Ed.2d 981 (1987) (upholding conviction of attorney, who was not an employee of the enterprise, a prosecutor's office, for violating RICO by conducting the affairs of the prosecutor's office through bribery);

*United States v. Bright,* 630 F.2d 804, 830–31 (5th Cir.1980) (upholding RICO conviction of a bail bondsmen, who was not an employee of the enterprise, a sheriff's office, for unlawfully participating in the affairs of the enterprise through bribery).

■ Appellants also argue that the defendants cannot be held liable for a RICO substantive violation with Aetna as the enterprise because they were not even "associates" of the enterprise, but were outsiders and, as outsiders, could not be said to "have participated in the conduct" of Aetna's affairs. This is an argument more of words than substance. The statute uses the phrase "associated with" rather than creating a category of "associates," narrowly defined to include fewer persons than those who may be said to have "associated with" an enterprise in a broader sense of this phrase. In ordinary usage, one who, for example, buys an insurance policy from an enterprise and depends on the solidarity of that enterprise, for protection against defined risks, has an association with, and may be said to have "associated with," the enterprise.

■ Each of the individual appellants was either an insured or a claimant under an Aetna policy, or an owner or operator of a body shop involved in repairing automobiles insured by Aetna. Three of the five individual Arsenal appellants (the Tirinkians and Peter Markarian) were both insureds and oper-

ators. As an insured, a claimant, or a body shop operator, each of the appellants was in a contractual relationship with Aetna. The body shop (also an appellant) and its owners and operators were "associated with" Aetna because each body shop about which evidence was received at trial was a place where Aetna employees conducted appraisals and where cars that were the subject of insurance were purportedly repaired.

*Third Element.* Appellants argue that no reasonable jury could have found that the appellants "participated directly or indirectly in the conduct of the enterprise's affairs" because the defendants did not "participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young,* —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

■ Contrary to the appellants' assertion, there was sufficient evidence for a reasonable jury to find that the defendants' activities met the definition of "participation" adopted by the Supreme Court in *Reves,* which is known as the "operation or management" test. *Id.* at ——, 113 S.Ct. at 1172. Appraising allegedly damaged vehicles and investigating, processing, and paying automobile insurance claims are vital parts of Aetna's business. By acting with purpose to cause Aetna to make payments on false claims, appellants were participating in the "operation" of Aetna.

The Supreme Court in *Reves* interpreted the phrase "conduct of the enterprise's affairs" to indicate a "degree of direction," which the court described as taking "some part in directing the enterprise's affairs." *Id.* at ——, 113 S.Ct. at 1170. The evidence was sufficient to support a finding that the individual Arsenal defendants' activities affected, in a material degree, the direction of Aetna's affairs by employees of Aetna. Appellants' activities caused Aetna employees having authority to do so to direct that other employees make payments Aetna otherwise would not have made. The Court in *Reves* emphasized that, as in this case, the defendants' "participation" could be "indirect" in the sense that persons with no formal position in the enterprise can be held liable under § 1962(c) for "participating in the con-

duct of the enterprise's affairs." *Id.* The evidence was sufficient to support a finding that each of the appellants participated in the conduct of Aetna's affairs in this way.

Moreover, in *Reves* the court expressly recognized that "an enterprise also might be operated or managed by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Id.* at ——, 113 S.Ct. at 1173. When viewed in the light most favorable to the plaintiff, in support of the verdict in this case, the evidence supports a finding that appellants caused the Aetna appraisers to approve false claims and conduct their appraisals in a manner contrary to Aetna's business practices and caused Aetna to pay out large sums of money on false claims. The evidence was sufficient to support a finding that appellants exerted control over the enterprise, if not by bribery (the example given by the Court in *Reves*), then at least by other methods of inducement. Since a reasonable jury could find that the appellants exerted some control over Aetna and took part in directing some aspect of the enterprise's affairs, the appellants' actions could be found to have satisfied the "operation or management" test.

■■■■■ *Fourth Element.* The final element necessary to support liability under § 1962(c) is that each defendant's participation was "through a pattern of racketeering activity." In order to establish a pattern of racketeering activity, the evidence must show that each defendant committed two acts of racketeering activity within the span of ten years. The predicate acts are defined by 18 U.S.C. § 1961 to include mail fraud, wire fraud, and bribery as well as aiding and abetting these offenses.

See *Oreto,* 37 F.3d at 751 (jury could find a pattern of racketeering activity for the purposes of § 1962(c) if the appellants aided and abetted the commission of at least two predicate acts);

see also *Pereira v. United States,* 347 U.S. 1, 9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954) (a person who aids and abets another in the commission of mail fraud, a violation of § 1341, also violates § 1341);

18 U.S.C. § 1961 (violations of § 1341 constitute predicate racketeering activity).

Although these terms refer to criminal offenses to which the beyond-reasonable-doubt burden of proof applies, a plaintiff in a civil RICO action may prove these acts by a preponderance of the evidence.

See *Combustion Engineering, Inc. v. Miller Hydro Group,* 13 F.3d 437, 466 (1st Cir.1993) (the preponderance of the evidence standard applies to fraud claims in civil RICO proceedings);

see also *Moss v. Morgan Stanley, Inc.,* 553 F.Supp. 1347 (S.D.N.Y.), *aff'd,* 719 F.2d 5 (2nd Cir.1983), *cert. denied sub nom. Moss v. Newman,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984) (although proof in civil proceedings under RICO requires only a preponderance of the evidence, which is a lower standard of proof than in criminal proceedings, the standard does not relate to the elements of the predicate crimes, but to the burden that the plaintiff bears in showing the elements).

■■■■ The elements of a mail fraud violation are a scheme to defraud and the use of the mails to execute or further this scheme.

*United States v. Brien,* 617 F.2d 299, 311 (1st Cir.), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980).

The plaintiff alleged that each defendant committed predicate acts of mail fraud.

■■■■ The intentional filing of false insurance claims or false completed work forms in order to obtain payments from Aetna constitutes a "scheme to defraud" Aetna. The plaintiff does not need to prove that each defendant personally used the mails but only that the defendant acted "with knowledge that the use of the mails will follow in the ordinary course of business, or [acted in circumstances] where such use can be reasonably foreseen." *United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974). In this case, it could reasonably be foreseen by each defendant that either an insured, a claimant, a body shop or an appraiser would use the mails in connection with each of the fraudulent claims, or that Aetna would use the mails to send payments to the recipients. All of these uses of the

mails were in furtherance of the defendants' fraudulent scheme.

> See *United States v. Martin,* 694 F.2d 885, 890 (1st Cir.1982) (refund checks mailed by an insurance company to the defendant, an insurance agent, were closely enough related to the agent's insurance fraud scheme to bring his conduct within the statute).

 In addition to proof of at least two predicate acts, there must be evidence of "continuity" sufficient to show that the predicate acts constitute a "pattern" of racketeering activity. *Boylan,* 898 F.2d at 250. Continuity may be established by proving that the predicate acts "form a closed period of repeated conduct" or that they "are a regular way of conducting the enterprise."

> *Id.;*
>
> see also *Digital Equipment Corp. v. Currie Enterprises,* 142 F.R.D. 16 (D.Mass. 1992) (holding that the use of the mails forms a "pattern of racketeering activity" if the uses are related and they amount to, or pose threat of, continued illegal activity).

The evidence of the ongoing succession of fraudulent claims presented in this case easily satisfies this requirement.

The appellants do not dispute that each fraudulent claim is an act of mail fraud and that mail fraud is sufficient to constitute a predicate offense under the RICO statute. Similarly, the appellants do not contend that the fraudulent insurance claims were unrelated or so dissimilar as to lack the continuity necessary to establish a "pattern" of racketeering activity. The appellants simply contend that there was no evidence of fraud on the part of any of the appellants. We have concluded that this assertion is contrary to the record.

### D. *RICO Conspiracy under Section 1962(d)—Count IX*

 In addition to finding the individual Arsenal defendants liable for a RICO substantive violation with Aetna as the enterprise, the jury also found each of the individual Arsenal defendants liable for a RICO conspiracy violation under § 1962(d). Liabil-

ity on this theory is proved against a defendant by showing (1) the existence of enterprise affecting interstate commerce, (2) that the defendant knowingly joined the conspiracy to participate in the conduct of the affairs of the enterprise, (3) that the defendant participated in the conduct of the affairs of the enterprise, and (4) that the defendant did so through a pattern of racketeering activity by agreeing to commit, or in fact committing, two or more predicate offenses. *See Boylan,* 898 F.2d at 241.

Even though no party objected (on grounds relevant here) to the trial court's charge to the jury on the elements of the alleged RICO conspiracy (as well as the elements of the alleged RICO substantive violations), we have examined the charge to the jury and determined it to be consistent with the elements of a RICO conspiracy as we have stated them here. In arriving at this formulation, we have been sensitive to the fact that earlier cases in this circuit used the phrase "knowingly joined the enterprise."

> *United States v. Angiulo,* 847 F.2d 956, 964 (1st Cir.), *cert. denied,* 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988); *United States v. Winter,* 663 F.2d 1120, 1136 (1st Cir.1981), *cert. denied,* 460 U.S. 1011, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983).

In *Boylan,* the court first used this same phrase ("knowingly joined the *enterprise* "), 898 F.2d at 241 (emphasis added), but in a passage following shortly thereafter referred to whether the defendants had knowingly joined the *conspiracy.*

> *Id.* ("Our inquiry thus reduces to whether such a conspiracy, knowingly joined by all defendants, was satisfactorily proven.").

In *Boylan* (and perhaps the earlier cases as well), this difference in phrasing was immaterial to the outcome of the case. This was so in *Boylan* because the evidence was undisputed that all of the defendants alleged to have joined the conspiracy were indisputably employees of the Boston Police Department, the alleged enterprise. In the present case, on the other hand, plaintiff alleged that defendants who were not employees of Aetna (the enterprise in Count VIII) knowingly joined the conspiracy. For this reason we

have addressed the issue more precisely in our formulation, stated above, of the elements of a RICO conspiracy, as applied to this case.

■ We conclude that the issue we must consider is not whether the defendants knowingly joined the victim enterprise (as first phrased in *Boylan*) but (as later stated in that Opinion) whether the defendants knowingly joined a conspiracy. We conclude that the evidence is sufficient to support a finding that each of the appellants "knowingly joined" the § 1962(d) RICO conspiracy.

■ The alleged § 1962(d) RICO conspiracy (Count IX) was a conspiracy to violate § 1962(c). The major difference between a violation of § 1962(c) itself (such as Count VIII) and a violation of § 1962(d) based on § 1962(c) (such as Count IX) is the additional required element that the defendant knowingly joined a conspiracy to violate § 1962(c). Another difference is that, to prove that a defendant violated § 1962(c), it is necessary for the plaintiff to prove two predicate offenses; under § 1962(d), in contrast, this is not an element required to be proved. To prove a violation of § 1962(d), it is enough to prove that a defendant *agreed* with one or more others that two predicate offenses be committed. *See Boylan,* 898 F.2d at 252. In the present case, this latter difference is of no practical consequence because we conclude that there was sufficient evidence to support a finding that each defendant in fact committed two predicate offenses.

■ One assertion, perhaps implicit in the appellants' argument, is that, in order to prove each defendant liable for RICO conspiracy (a § 1962(d) violation), the plaintiff was required to prove a conspiracy to defraud Aetna in which each of the Arsenal defendants conspired directly with one or more persons associated with each of the other body shops.

This assertion is incorrect because it depends necessarily upon a misinterpretation of § 1962(d) with respect to the elements necessary to prove a RICO conspiracy. It is true that to find a defendant liable under § 1962(d) one must find that the defendant conspired to violate a subsection of § 1962. It is not necessary, however, to find that each defendant knew all the details or the full extent of the conspiracy, including the identity and role of every other conspirator. *Boylan,* 898 F.2d at 242 ("A RICO conspiracy does not demand ... that all defendants participate in all racketeering acts, know of the entire conspiratorial sweep, or be acquainted with all other defendants.")

All that is necessary to prove this element of the RICO conspiracy, against a particular defendant, is to prove that he or she agreed with one or more co-conspirators to participate in the conspiracy. Moreover, it is not necessary for the conspiratorial agreement to be express, so long as its existence can plausibly be inferred from words, actions, and the interdependence of activities and persons involved. *United States v. Concemi,* 957 F.2d 942, 950 (1st Cir.1992). In this case, the jury reasonably could have found that, although each defendant may not have known the entire sweep of the conspiracy, each defendant knew that he or she was a part of a larger fraudulent scheme. For example, since the evidence supported a finding that each of the Arsenal defendants was well aware of the fraudulent business practices of Dexter and Cummings, the jury could find that all of the Arsenal defendants knew they were part of a larger conspiracy in which other persons made uses similar to their own of fraudulent appraisals by Dexter, Cummings, or both.

■ A defendant who does not know the "entire conspiratorial sweep" is nevertheless jointly and severally liable, in the civil context, for all acts in furtherance of the conspiracy. Using a common metaphor, one may say that Cummings and Dexter, the Aetna appraisers, were at the hub of the overall RICO conspiracy, providing the central point through which all the defendant body shops were connected. A jury could reasonably find that, through Cummings and Dexter, the conspiratorial sweep extended to all the body shops and most, if not all of the individual defendants. The jury in this case found that the RICO conspiracy included all other appellants, except for Arsenal Auto

Repairs, Inc. and Betty Arhaggelidis. We need not consider whether the evidence would have supported a finding against these two appellants as well. That was not essential to the liability of others under this theory, nor to the liability of these two appellants under a different theory.

From evidence of the extensive dealings of all other appellants with Cummings and Dexter, the jury could have inferred an agreement, to defraud Aetna, among all of the Arsenal defendants (Arhaggelidis not being an Arsenal defendant) and the appraisers. Through evidence of each individual Arsenal defendant's actions, the jury could infer that each defendant had the requisite state of mind for a RICO conspiracy violation—knowing participation.

> *See Boylan,* 898 F.2d at 242 ("[The plaintiff] may prove [a RICO conspiracy] through the use of circumstantial evidence, so long as the total evidence, including reasonable inferences, is sufficient to warrant [the jury's findings].").

The appellants do not dispute that Dexter and Cummings conspired with the owners and operators of the other body shops. Through Dexter and Cummings, the Arsenal defendants were linked to all the other defendants who were found liable for RICO conspiracy. Thus, upon proof that each defendant committed or agreed to the commission of two predicate offenses, each defendant could be held liable for the overall RICO conspiracy.

Moreover, although it was not necessary for the plaintiff to prove that the Arsenal defendants knew the identity of defendants from the other body shops and conspired directly with them, the evidence was sufficient for the jury to infer that this was in fact the case. For example, Zareh Tirinkian testified that he frequently attended parties and other social engagements with the operators of the other body shops. Although Tirinkian denied discussing his practice of filing fraudulent insurance claims with the other body shop owners, the evidence showed that the body shops' racketeering activities were unusually similar. The body shops all defrauded Aetna, they reported nearly identical types of fraudulent claims, and they obtained appraisals from the same appraisers. Evidence of these similarities, considered along with other evidence, was sufficient to support a jury finding that the owners of the body shops conspired directly with one another.

> *Id.* at 242 (a jury may infer that a single overall conspiracy existed when evidence of racketeering acts shows "hallmarks of similarity" and "a significant degree of interconnectedness").

## E. Civil Conspiracy—Count X

Defendant Arsenal Auto Repairs, Inc. was not held liable under any RICO theory. The judgment against Arsenal Auto rests instead, upon the jury's finding that Arsenal Auto was liable for civil conspiracy. The appellants' brief does not challenge this finding against Arsenal Auto on the basis of insufficiency of the evidence. For this reason, the following discussion of civil conspiracy concerns Arhaggelidis's appeal only.

Appellant Arhaggelidis challenges the judgment entered against her for civil conspiracy on the ground of insufficiency of the evidence. The plaintiff alleged that Ms. Arhaggelidis conspired with her fellow Rodco/P & B Autobody defendants to defraud Aetna.

The nature of a "civil conspiracy" and the proof required to invoke this type of claim differ significantly from those applying to criminal conspiracies generally and to RICO conspiracies in particular. Under Massachusetts law, either of two possible causes of action may be called "civil conspiracy."

*First.* There is precedent supporting a "very limited cause of action in Massachusetts" for "civil conspiracy" of a coercive type. *See Jurgens v. Abraham,* 616 F.Supp. 1381, 1386 (D.Mass.1985). "In order to state a claim of [this type of] civil conspiracy, plaintiff must allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently."

> *Id.* (quotations omitted) (citing *Fleming v. Dane,* 304 Mass. 46, 22 N.E.2d 609 (1939)).

Plaintiff, in paragraph 480 of Count X of its complaint, does allege a circumstance that, if proved, might constitute such a "peculiar power of coercion." The allegation is that "defendants were collectively able to negate the safeguards that would have prevented any one group of defendants, acting alone from accomplishing a fraud of this type." (App. 609).

Despite the fact that the pleading was sufficient to state a claim of this type of civil conspiracy, however, Count X was tried and the jury was ultimately instructed on a second and quite different "civil conspiracy" cause of action.

*Second.* This second type of civil conspiracy is more akin to a theory of common law joint liability in tort. It is explicitly recognized in Massachusetts law.

> *See Gurney v. Tenney,* 197 Mass. 457, 84 N.E. 428, 430 (1908);

> *see also Phelan v. Atlantic Nat'l Bank,* 301 Mass. 463, 17 N.E.2d 697, 700 (1938) ("[A]verment of conspiracy does not ordinarily change nature of cause of action [sounding in tort] nor add to its legal force.").

In the civil context, both elsewhere and in Massachusetts, the word conspiracy is frequently used to denote vicarious liability in tort for "concerted action."

> *See W. Page Keeton, Prosser and Keeton on Torts* 322 (5th ed. 1984);

> *Restatement (Second) of Torts* § 876 cmt. b (1977).

That is, the concept is invoked to support liability of one person for a tort committed by another. For liability to attach on this basis, there must be, first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement.

> *See Restatement (Second) of Torts* § 876 cmt. b.

Where two or more persons act in concert, each will be jointly and severally liable for the tort.

> *See id.;*

> *see also New England Foundation Co. v. Reed,* 209 Mass. 556, 95 N.E. 935, 935 (1911) ("The gist of a civil action of this sort is not the conspiracy, but the deceit or fraud causing damage to the plaintiff, the combination being charged merely for the purpose of fixing joint liability on the defendants.").

According to the Restatement:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him....

Restatement (Second) of Torts, § 876 (1977).

The Supreme Judicial Court has implied that the Massachusetts common law of civil conspiracy encompasses liability of this nature, even if the elements of liability are not in all respects identical to those defined in this section of the Restatement.

> *Kyte v. Philip Morris, Inc.,* 408 Mass. 162, 556 N.E.2d 1025, 1027 (1990) (citing *Gurney,* 84 N.E. 428, and declining to "pause to determine whether the principles of § 876 and the law of the Commonwealth are, in all respects, in complete accord" because the parties accepted this section as governing the principles of civil conspiracy in the Commonwealth);

> *see also Gurney,* 84 N.E. at 430 (alluding to concert of action theory similar to § 876(a));

> *Payton v. Abbott Labs,* 512 F.Supp. 1031, 1035 (D.Mass.1981) ("The concert of action theory in Massachusetts tracks § 876(a) of the Restatement.").

The district court, in this case, instructing the jury on civil conspiracy, stated:

> The essence of conspiracy is that the person agreed with one or more other persons [to commit an unlawful act].... Plus for conspiracy ... somebody has to do something to attempt to make it come about.

(App. 4817–18).

Although this instruction is not precisely in accord with Restatement § 876, the appellant has not presented any issue before this court regarding the instruction. In any event, she would be precluded from doing so here, not

having objected to the instruction in the district court. Fed.R.Civ.P. Rule 51.

She did, however, challenge the sufficiency of the evidence by her motion for judgment as a matter of law. We conclude, nevertheless, that we need not determine the precise state of Massachusetts law on concerted action in tort, because under any plausible formulation of Massachusetts law, a jury reasonably could find that Betty Arhaggelidis acted in concert with her husband and fellow Rodco/P & B Autobody defendant to defraud Aetna.

The jury, with support in evidence, found that Rodco/P & B Autobody was associated with thirty-seven fraudulent claims that were submitted to Aetna, and that Betty Arhaggelidis was directly involved in six of those claims.

From the evidence at trial, the jury reasonably could find also that Ms. Arhaggelidis "acted in concert" with her husband, the owner of Rodco/P & B Autobody, pursuant to a common design. All six claims with which she was connected involved claimed damage purportedly repaired at Rodco/P & B Autobody. All six claims were supported by appraisals by Mr. Cummings, a codefendant. Her husband, Petros Arhaggelidis, allegedly repaired many of the cars personally. Evidence was received that she represented to Aetna that the repairs had been made. Also, evidence was received of other fraudulent conduct on the part of Mr. Arhaggelidis: he was a claimant on several claims the jury found to be fraudulent, and he made payments to Mr. Cummings totalling over $35,000, which the jury could have inferred to be bribes. From the evidence as a whole, the jury could infer an agreement between Betty Arhaggelidis and her husband, under which they played different roles, but nevertheless acted together with a common design to defraud Aetna.

## IV. SUBMISSION OF CLAIMS TO THE JURY

The Arsenal appellants argue that only sixteen claims involving the Arsenal defendants should have been submitted to the jury, instead of the thirty-three claims involving the Arsenal defendants on which evidence was heard. The appellants correctly assert that only sixteen of these thirty-three claims were made to Aetna; the other seventeen claims were made to other insurance companies (except for Tareh Tirinkian's worker's compensation claim).

Aetna recovered damages for the sixteen automobile insurance claims paid by Aetna— claims the jury found to be fraudulent. The trial court admitted evidence of the other seventeen claims because each was relevant to the determination of fraud with respect to one or more of the sixteen Aetna claims at issue. For example, many of the claims to other insurance companies duplicated one or more of the claims to Aetna. In one or more instances, damage that was allegedly sustained in one accident was later reported to Aetna in connection with another alleged accident. On this appeal we need not decide whether the district court was correct in admitting the evidence corresponding to each of the seventeen claims because, although in some instances the appellants objected to the introduction of this evidence at trial, their briefs in this court have not directly challenged these rulings of the district court.

Instead, the appellants argue that the verdict form should not have asked the jury to determine whether each of these seventeen other claims was fraudulent. We will assume, without deciding, that the trial court's inclusion in the verdict form of questions about these seventeen claims was unnecessary because at most they concerned findings of an evidentiary nature rather than findings on ultimate issues of fact that had to be decided to determine whether each element of some claim or defense was proved.

Since the appellants do not even articulate grounds of an argument for prejudicial error, however, much less show that they were in fact prejudiced in any way by the submission of these seventeen other insurance claims to the jury, we have no occasion to determine whether their submission was improper. The trial court did consider and reject the Arsenal defendants' arguments that they were prejudiced by the jury's hearing evidence of these seventeen claims. The trial court allowed the evidence

because it tended to support a finding of a common pattern and scheme of fraud that the jury might find extended to all the Aetna claims and others as well. Even assuming that an issue regarding admissibility of the evidence is properly preserved for our consideration, we conclude that this ruling was not an abuse of discretion. Nor was it an abuse of discretion to submit to the jury questions about these claims. It is true that the jury's findings with respect to the seventeen other insurance claims were not essential to the judgment entered on the verdict. We note, however, that an argument can be made, although the appellee does not advance it on appeal (and need not do so in view of other findings), that each of these claims, if found to constitute mail fraud, would constitute a predicate act for the purposes of Count VI, the substantive RICO violation with Arsenal Auto as the enterprise. For example, one could argue that two related, fraudulent claims, although one was submitted to Aetna and one was submitted to another insurance company, would constitute a "pattern of racketeering activity" through which the defendants participated in the conduct of the affairs of Arsenal Auto.

In considering the sufficiency of evidence, we need not address the merits of such an argument because even when limiting the scope of our review of the evidence to the sixteen Aetna insurance claims, we find that there was sufficient evidence to support the finding that each of the Arsenal defendants violated RICO § 1962(c) by committing two related, predicate acts of mail fraud.

### V. UNFAIR TRADE PRACTICES: MASS GEN.L.CH. 93A

■■■ Mass.Gen.L. ch. 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen.L. ch. 93A § 2. The statute provides for treble damages in the case of a willful violation of the statute. The jury found that Zareh Tirinkian, Jack Markarian, and Peter Markarian's deceptive business practices constituted a willful violation of this statute.

Appellants contend that their dealings with Aetna were purely personal and that they did not violate this statute, because they did not deal with Aetna in a business context.

Appellants are correct in asserting that the phrase "persons engaged in ... trade or commerce" refers specifically to individuals acting in a business context. *See Lantner v. Carson*, 374 Mass. 606, 373 N.E.2d 973 (1978). Contrary to the appellants' assertions, however, the evidence was sufficient for the jury to find that these three defendants were acting in a business context and engaged in unfair or deceptive business practices in violation of this statute.

All three defendants were involved in the Arsenal Auto business: Zareh Tirinkian was an owner and Jack and Peter Markarian performed repair work. The jury found that family members and friends of these defendants submitted fraudulent claims to Aetna for damages. Most of these cars were appraised by Aetna appraisers, and most of the repair work was allegedly performed at Arsenal Auto. Many of the work completion forms submitted to Aetna with respect to these claims bear the stamp "Arsenal Auto Repairs," certifying that Arsenal Auto completed the repair work.

Under Massachusetts law, "unfair and deceptive acts or practices" include acts of fraud.

> *See Evans v. Yegen Associates, Inc.*, 556 F.Supp. 1219, 1227 (D.Mass.1982) ("Acts of fraud clearly fall within § 2 [of Mass Gen.L. ch. 93A].");
>
> *see also Heller v. Silverbranch Const. Corp.*, 376 Mass. 621, 382 N.E.2d 1065, 1069 (1978) (Chapter 93A expands common law notion of fraud).

We conclude that the evidence was ample to support findings of fraudulent practices by these three defendants. From the evidence before them, the jury could find that these three defendants used deceptive business practices in their dealings with Aetna in violation of Mass.Gen.L. ch. 93A.

### VI. JURY INSTRUCTIONS

In addition to arguing that the evidence was insufficient to support the finding that each of the individual Arsenal appellants violated 18 U.S.C. § 1962(c) and § 1962(d), the

appellants assign error in the district court's jury instructions on these counts.

■■■■■ The court instructed the jury that "[t]he term 'participate in the conduct of an enterprise' includes the performance of acts, functions or duties which are related to the operation of the enterprise." The appellants argue that this instruction on the meaning of the phrase "participated directly or indirectly in the conduct of the enterprise's affairs" failed to comport with the "operation or management" test adopted by the Supreme Court in *Reves v. Ernst & Young,* ─── U.S. ───, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

The appellants are precluded from successfully making this argument on appeal, however, since they failed to object on this ground at trial. Fed.R.Civ.P. Rule 51. Although the appellants contend that they objected to this instruction, the most that can be said is that they objected to the "RICO—Aetna as the enterprise" charge on the ground that Aetna could not be the enterprise as a matter of law. *See* App. 4833. The record shows that the court did not interpret this to be an objection to any jury instruction, but merely further argument in support of their motion for judgment as a matter of law. *See* App. 4834 ("You've made a directed verdict, I've overruled. Of course you object to the theories going to the jury.... Your rights are saved as to that."). In any case, even if this were to be interpreted as an objection to the instruction, it is not sufficient to preserve an issue for appeal because it does not "state distinctly the matter objected to and the grounds for objection."

Fed.R.Civ.P. Rule 51;

> see also *Jordan v. United States Lines, Inc.,* 738 F.2d 48 (1st Cir.1984) (holding that appellant's objection to the trial court's instruction on the definition of "unseaworthiness" was not specific enough to satisfy Rule 51).

Moreover, even if viewed as an objection, counsel's statement is reasonably understood as an objection only to the definition of "enterprise" and not to the definition of "participate in the conduct of the affairs." The appellants never objected to the district court's definition of "participate in the con-

duct of the affairs of the enterprise," nor did they ever mention the *Reves* test or offer any alternative to the instruction given by the judge.

Although this jury instruction is arguably open to a broader interpretation, it is also reasonably understood to convey a meaning consistent with the Supreme Court's language in *Reves* that in order to be liable under RICO, a defendant must "participate in the operation or management of the enterprise itself." *Reves,* ─── U.S. at ───, 113 S.Ct. at 1173. "Because of the [appellants'] failure to comply with Rule 51, we review the trial court's instructions only for plain error." *Poulin v. Greer,* 18 F.3d 979, 982 (1st Cir. 1994). "The plain error rule should be applied sparingly and only in exceptional cases or under peculiar circumstances to prevent a clear miscarriage of justice." *Id.* (quotations omitted). The alleged error in this instruction fails to pass this test.

## VII. JURY TRIAL ON DAMAGES

### A. *Post–Verdict Hearings and the Standard of Decision*

■■■■ The Arsenal appellants challenge the judgment entered against them on the ground that they were denied a jury trial on damages in violation of the Seventh Amendment guarantee of the right to a jury trial upon a timely demand. Fed.R.Civ.P. 38. Appellants demanded a jury trial and agreed to a bifurcation of liability issues and damages. Following the jury trial and jury verdict on the issues of liability, the district court properly determined that no genuine disputes of material fact remained with respect to damages.

The appellants' challenge fails because, after the jury verdict, damages could be determined purely "as a matter of law," in the sense that reasonable factfinders applying the correct legal standard could come to but one determination as to the amount of damages to be awarded under the jury's findings on liability.

Precedents regarding summary judgment provide useful guidance on issues arising af-

ter jury verdict in the first phase of a phased trial such as occurred in this case.

■■■ In the pretrial context, regardless of any jury demand made by the parties, summary judgment is warranted when no triable fact issues have been identified.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is appropriate when there are no disputed issues of material fact);

see also Plaisance v. Phelps, 845 F.2d 107 (5th Cir.1988) (plaintiff did not have an absolute right to a jury trial where there was no genuine issue of material fact, since the function of a jury is to try disputed material facts);

Bloomgarden v. Coyer, 479 F.2d 201, 206 (D.C.Cir.1973) ("The summary judgment procedure is properly and wholesomely invoked when it eliminates a useless trial....").

In addition, under Federal Rule of Civil Procedure 16, the court may take action to formulate and simplify the issues "including the elimination of frivolous claims or defenses." Fed.R.Civ.P. 16. Rule 16 also authorizes courts to take action with respect to the "appropriateness and timing of summary adjudication under Rule 56." Id. Moreover, Rule 16 was intended to confirm the power of the court to "identify [ ] litigable issues" without awaiting a formal motion for summary judgment. Advisory Committee Notes, 1983 Amendment.

In this case, the trial judge's determination regarding the damages to be awarded was made after the jury trial on liability. At the conference on damages held after trial, the court stated its intention to enter a judgment without another trial if no genuine dispute of fact material to the damages determination remained. In a conference with counsel, the court stated, "[u]nder Rule 16, I have the power to narrow the issues for trial ... I can in effect talk through a proceeding akin to a motion for summary judgment."

This court has held that a district court may grant summary judgment sua sponte as long as two requirements are met. Stella v. Town of Tewksbury, 4 F.3d 53, 55 (1st Cir.

1993). "First the discovery phase must be sufficiently advanced that the court can make an accurate determination of whether a genuine issue of material fact [exists]." Id. (citation omitted). Second, "the target must have been on notice to bring forth all of its evidence." Id. " 'Notice' in this context means that the losing party ... received a fair opportunity to put its best foot forward." Jardines Bacata, Ltd. v. Diaz–Marquez, 878 F.2d 1555, 1560 (1st Cir.1989).

These two requirements were met. The discovery phase was not merely "sufficiently advanced." It was complete. And a trial on the liability issues had been completed. The appellants received notice and an opportunity to be heard. The district judge, before entering judgment, allowed the parties an opportunity to file written submissions on the issues that were raised at the conference.

In their post-trial memorandum, the appellants made substantially the same argument as they make before this court (discussed below), and in both instances without any proffer that they would be able to offer at a damages-phase trial any evidence that would raise a genuine dispute of fact that might be resolved by a factfinder in their favor.

### B. The Alleged Need for a Jury Trial

■■■ The appellants argue that a jury trial on damages was necessary to determine how much of each fraudulent claim was legitimate, that reported losses were merely exaggerated, and that Aetna's damages should be limited to the difference between the payment made by Aetna and the actual loss to the appellant. Each of these arguments fails because, as a matter of law, Aetna is entitled to damages equal to the entire amount of its payments on fraudulent claims, regardless of any portion of the claims that might have been shown to be supportable if no fraudulent enlargement of the claims had occurred.

We put aside Aetna's argument that appellants violated the cooperation clause of the various policies under which claims were made. In part that clause provides:

After an accident or loss, you or anyone else covered under this policy must cooper-

ate with us in the *investigation, settlement and defense of any claim or lawsuit....*
(App. 4800) (emphasis added). Earlier automobile insurance policy forms, from which this language in the Aetna policies at issue descended, contained an Assistance and Cooperation Clause, as it was then called. That clause initially appeared among conditions that applied only to liability coverages. The claims at issue here were made under collision coverage. No Massachusetts precedent has explicitly determined that this clause in policy forms like those at issue here applies to collision coverage. In these circumstances, any prediction about whether the Supreme Judicial Court will hold that this clause applies to collision coverage is speculative, but we need not make any prediction on this matter in order to decide this case. We assume in appellants' favor, without deciding, that the cooperation clause in these Aetna policies does not apply to claims under collision coverage.

The "cooperation clause," of course, is not the only provision concerning the obligations of insureds and claimants after an accident or loss. Other provisions concern giving notice and filing a proof of loss.

Appellants contend that one or another of various preclusion doctrines of insurance law bars Aetna from asserting that making a fraudulent claim is a violation of any of the provisions of the policy under which the claim is made. One reason all of the appellants' preclusion arguments fail is that on the facts of this case, as determined by supportable findings of the jury, every claim included in the trial court's calculation of the damages award has been found to be a fraudulent claim. In addition, every claim for which the Arsenal defendants were held liable was made within the scope of a RICO substantive violation and a RICO conspiracy, and every claim for which appellant Arhaggelidis was held liable was within the finding against her on the ground of civil conspiracy.

A claimant, in making a fraudulent claim, was committing a material breach—indeed, a most fundamental breach—of the contract between Aetna and its policyholder. This is true, of course, not only of a claim by the policyholder but also of any claim under the policy by any other person entitled by the terms of the policy to make a claim under the policy.

■ A breach as fundamental as this is a bar to the assertion of any further rights under the contract by the party guilty of the breach. This is a basic rule of contract law. *See* E. Allan Farnsworth, *Contracts* 632–38 (2d ed. 1990). It applies to insurance contracts as well as other contracts.

Appellants contend that one or another of various preclusion doctrines developed distinctively in insurance law nevertheless bars Aetna from asserting fraud by the appellants in this case. This contention fails because the jury findings in this case have negated at least one of the essential elements of each preclusion theory appellants attempt to invoke.

■ The jury's findings negate the voluntary relinquishment of known rights that is characteristic of waiver in the classic sense, the detrimental reliance by a claimant that is characteristic of estoppel in the classic sense, the voluntary choice of an option that is characteristic of election in the classic sense, and insurer overreaching of a less informed and unequal bargainer that is characteristic of cases in which precedents have stretched doctrines of waiver, estoppel, and election beyond their classic meaning to favor a disadvantaged insured.

*See generally id.* at 92–102, 319–23, 586–92;

John S. Ewart, *Waiver Distributed Among the Departments: Election, Estoppel, Contract, Release,* 7–9, 84–87 (1917);

John S. Ewart, *Waiver or Election,* 29 Harv.L.Rev. 724 (1916).

Appellants have not cited any precedent, in Massachusetts law or elsewhere, that supports application to any part of the verdict and judgment in this case of any preclusion doctrine establishing rights in favor of insurance claimants beyond those provided by the terms of the contract of insurance. These terms include the limitations, conditions, and exceptions as well as its clauses granting and defining the scope of coverage. Indeed, in view of the jury finding of a RICO substan-

tive violation with Aetna as victim, if there were any need or occasion to invoke principles of preclusion rather than ordinary contract doctrine to decide this case, the record would be more congenial to preclusion against a fraudulent claimant than to preclusion of any of Aetna's defenses.

Although the parties have not cited and we are not aware of any Massachusetts precedent directly determining the effect of fraudulent claims and RICO violations upon the measure of recovery to which the insurer is entitled, Massachusetts decisions on analogous issues support the judgment entered in this case. For example, Massachusetts courts have held in a number of different contexts that an insured who committed fraud either in obtaining a policy or in making a claim was precluded from recovering on a claim under the policy.

See *Airway Underwriters v. Perry*, 362 Mass. 164, 284 N.E.2d 604 (1972) (holding that an attempt to defraud the insurer was a violation of the policy's cooperation clause and a clause stating that the policy was void in case of fraud, and therefore insurer was relieved of its obligation to indemnify the insured or defend on the insured's behalf);

*Bockser v. Dorchester Mutual Fire Ins. Co.*, 327 Mass. 473, 99 N.E.2d 640 (1951) (holding that an insured, whose property was destroyed by fire and whose agent attempted to defraud the insurance company by exaggerating the losses was precluded from recovery under the policy in light of a provision of the policy rendering the policy void if the insured attempted to defraud the company either before or after a loss).

In addition, fraud on the part of a party to a contract has been determined to be a breach of the covenant of good faith and fair dealing. *Glaz v. Ralston Purina Co.*, 24 Mass.App.Ct. 386, 509 N.E.2d 297 (1987).

The appellants do not contend that the amounts that Aetna paid out on the policies were ever in dispute. These amounts were the only facts, in addition to the facts determined by the jury in the liability phase, that were material to the court's judgment. Although there may have been some dispute as to the existence and extent of any actual losses by the defendants, any dispute about these facts was not material to the judgment because the appellants' fraud (by either exaggerating or completely fabricating losses) precluded them from asserting any right to recover for actual losses under the insurance contracts. Since no triable fact disputes remained, the appellants were not denied their right to a jury trial. The court's determinations of the sums certain to be awarded against the defendants were properly made as matters of law—that is, by the judge without submission to a jury.

## VIII. ATTORNEYS' FEES

As a part of the judgment in this case, the district court awarded $1,500,000 in costs, expenses, disbursements, and attorneys' fees to the plaintiff. Under the terms of the judgment, each individual Arsenal defendant is jointly and severally liable for the entire amount of $1,500,000.

The sole challenge in this appeal to this award or the amount of it is that the Arsenal appellants argue that the district court improperly held them liable for not only the attorneys' fees expended in this case but also the attorneys' fees expended in a related case entitled *Aetna Casualty and Surety Co. v. Sport Auto Body, Inc.*, No. 91–11718 (the "*Sport* case"). In the *Sport* case, Aetna alleged that Sport Auto Body, Inc. and its operators were a part of the same conspiracy to defraud Aetna, which included Arsenal Auto and the other autobody shops. The *Sport* case was consolidated with this case on May 17, 1992. Subsequently, the *Sport* defendants defaulted and the Clerk entered judgment against them.

The appellants argument fails because 18 U.S.C. § 1964(c) authorizes the recovery of reasonable attorneys' fees by a prevailing plaintiff in a civil RICO case. 18 U.S.C. § 1964(c). Since the *Sport* case was consolidated with this action and judgment was entered against the *Sport* defendants and the individual Arsenal defendants for the same RICO violations, the district court correctly held the Arsenal defendants jointly and severally liable for reasonable attorneys'

fees expended by Aetna for the entire suit. Arsenal appellants argue, but unconvincingly, that the district court's order of consolidation did not extend to the phased trial. The district court rejected the argument, and we find no abuse of discretion in this ruling.

## IX. PREJUDGMENT INTEREST

Raising this issue for the first time in a reply brief on appeal, appellant Jack Markarian challenges the inclusion, in the judgment against him, of prejudgment interest on the treble damages awarded under the RICO claims. He argues that since the treble damages are punitive in nature and not compensatory, prejudgment interest is inappropriate.

■ The appellant failed to raise the issue either at trial or even in his opening brief, which was submitted on behalf of all the Arsenal defendants. The first statement of this contention appears in this appellant's reply brief, filed on his behalf by new counsel representing him alone. In these circumstances, we hold that he has failed to preserve this issue for appeal.

*American Automobile Manufacturers Assoc. v. Commissioner,* 31 F.3d 18, 25 (1st Cir.1994) (appellant failed to preserve issue for appeal when the argument was first raised in his reply brief);

*Frazier v. Bailey,* 957 F.2d 920, 932 n. 14 (1st Cir.1992) (same);

*Pignons S.A. de Mecanique v. Polaroid Corp.,* 701 F.2d 1, 3 (1st Cir.1983) (same);

*see also McCoy v. Massachusetts Institute of Technology,* 950 F.2d 13, 22 (1st Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992) ("It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal.").

"[A]n appellee is entitled to rely on the content of an appellant's [opening] brief for the scope of issues appealed." *Pignons S.A.,* 701 F.2d at 3. When an argument is first raised in a reply brief, the appellee is not given an adequate opportunity to respond. *See Sandstrom v. Chemlawn Corp.,* 904 F.2d 83, 87 (1st Cir.1990). Moreover, the court of appeals is deprived of the benefit of written submissions by all the parties. *Id.*

This court has recognized that if exceptional circumstances are shown, an issue may be considered even though it has not been timely raised.

*Id.* (citing *United States v. LaGuardia,* 902 F.2d 1010, 1013 (1st Cir.1990)).

Such exceptional circumstances include arguments that are "so compelling as virtually to insure the appellant's success" or arguments that must be ruled upon to avoid a miscarriage of justice.

*Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir.1979).

■ The argument presented by appellant Jack Markarian is not one that satisfies this standard. A district court's decision to award prejudgment interest under RICO is ordinarily subject to review under the "abuse of discretion" standard.

*Cf. Earnhardt v. Commonwealth of Puerto Rico,* 744 F.2d 1, 3 (1st Cir.1984) (abuse of discretion standard is applied to district court's decision whether to award prejudgment interest in a Title VII case);

*see also Abou–Khadra v. Mahshie,* 4 F.3d 1071, 1084 (2nd Cir.1993), *cert. denied, sub nom. Bseirani v. Mahshie,* — U.S. —, 114 S.Ct. 1835, 128 L.Ed.2d 463 (1994) ("Since the RICO statute does not contain any provisions concerning the award of prejudgment interest, the district court had discretion as to whether to award such interest.");

*Louisiana Power and Light Co. v. United Gas Pipe Line Co.,* 642 F.Supp. 781 (E.D.La.1986) (same).

■ We recognize that there is some force in the appellant's argument that the district court abused its discretion in awarding prejudgment interest. The appellant reasons that treble damages under RICO constitute punitive damages, and that since prejudgment interest on punitive damages is ordinarily inappropriate, the district court erred in awarding prejudgment interest in this case.

*Cf. McEvoy Travel Bureau, Inc. v. Norton Co.,* 408 Mass. 704, 563 N.E.2d 188, 196 (1990) (holding that prejudgment interest

should not be awarded in Mass.Gen.L. ch. 93A cases because multiple damages are punitive in nature);

 *Wickham Contracting Co. v. Local Union No. 3, Int'l Brotherhood of Elec. Workers,* 955 F.2d 831, 834 (2nd Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992) (prejudgment interest should not be awarded when damages are punitive in nature).

It may reasonably be argued, however, that RICO damages are primarily compensatory in nature, and thus prejudgment interest was properly awarded.

 *Cf. Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1310 (7th Cir.1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989) ("Although there is some sense in which RICO treble damages are punitive, they are largely compensatory in the special sense that they ensure that wrongs will be redressed in light of the recognized difficulties of itemizing [the damages caused from racketeering activity].").

Thus, the appellant's argument is not so compelling as to ensure the appellant's success. Nor is his argument so clearly correct that a failure to rule in his favor on this issue constitutes a miscarriage of justice. Therefore, the appellant cannot prevail under the *Johnston* standard.

## CONCLUSION

 In summary, we conclude that none of the arguments advanced on appeal supports reversal of any aspect of the judgment in this case. The district court commendably fashioned an order for phasing of trial in two consolidated cases, with all disputed and material issues bearing on liability to be tried before a jury in the first phase. In post-verdict proceedings analogous to a hearing on a motion for summary judgment, the district court correctly determined that no genuine dispute of fact remained for jury determination and that final judgment should be entered for Aetna on the jury verdict, establishing liability, and on the court's calculation of damages based upon facts disclosed on the record and not subject to genuine dispute. The district court's pretrial order for phasing and its post-verdict proceedings were well-tailored to the distinctive characteristics of this legally and factually complex litigation. Together they achieved fair and appropriate adjudication of all claims and defenses on the merits. Proceeding in this fashion, the court also effected substantial reductions of delay and cost for the parties and the court system, an objective strongly commended by Rule 1 of the Federal Rules of Civil Procedure.

 The judgment of the district court is *AFFIRMED.*